[Civ. No. 2298. First Appellate District.—March 2, 1918.]

JOHN NELSON, Respondent, v. CLARENCE G. THOMAS et al., Appellants.

DEED—DELIVERY—INSUFFICIENCY OF EVIDENCE.—In this action to quiet title, involving the delivery of a deed under which defendants claimed title, it is held that the evidence sustains the finding to the effect that the deed was never delivered, and was intended as a testamentary disposition to take effect after the death of the grantor, and not as a present conveyance.

QUIETING TITLE—NONDELIVERY OF DEED—RIGHT TO MAINTAIN ACTION—LEGAL TITLE.—A suit to quiet title based upon nondelivery of a deed from plaintiff to defendants under which the latter claimed title may be maintained, as under such circumstances the legal title is in the plaintiff.

APPEAL from a judgment of the Superior Court of Humboldt County. Clifton H. Connick, Judge.

The facts are stated in the opinion of the court.

Thos. S. Selvage, for Appellants.

Coonan & Kehoe, L. M. Burnell, and J. S. Burnell, for Respondent.

KERRIGAN, J.—This was an action to quiet title. Judgment was rendered in favor of plaintiff, and the defendants appealed, Clarence G. Thomas being thereafter substituted for C. S. Thomas, one of the original defendants.

36 Cal. App.—28

The defendants in the action claimed title to the property described in the complaint by virtue of an instrument dated December 30, 1913, purporting to be a deed from plaintiff Nelson to C. S. Thomas and Ella Thomas, his wife, and which property they claimed to have received from Nelson as a gift. Nelson, on the other hand, while admitting that he signed and acknowledged this paper, supported his claim of title by evidence that in signing it he supposed he was executing his will, and therefore denied that on December 30th, or at any other time, he either made or intended to make or deliver a deed of the property to the defendants. The court accepted this view of the transaction, and entered judgment accordingly quieting plaintiff's title.

The circumstances attending the execution of the instrument in controversy are briefly these: About the year 1879 Nelson acquired a small ranch in the southern portion of Humboldt County, at a place known as Elk Ridge, where he engaged in cattle-raising. From time to time he increased his holdings until he had acquired the property here involved, a tract of some one thousand seven hundred acres. About the year 1890 the defendants went to work for Nelson on his ranch. C. S. Thomas was a carpenter, and built barns, outhouses, and fences for Nelson, while his wife Ella was engaged there as cook and housekeeper. They were thus respectively employed for about a year, when they moved to Briceland, a place about eight miles distant. The relationship between Nelson and Thomas became very close and strong, so much so that Nelson would sign without reading any paper that Thomas might present to him, according to a statement attributed by one of the witnesses to Thomas. At Briceland, Thomas, in addition to pursuing his regular calling, occupied the offices of justice of the peace and notary public, and for four or five years prior to the execution of the disputed deed he transacted Nelson's legal business for him. On December 28, 1913, Nelson was single, about sixty-eight years of age, and in poor health. About a week before this date he had told Thomas that because of ill health he could no longer look after his stock, and had concluded to lease his property, whereupon Thomas offered to try to find a tenant for him, and in a few days sent to Nelson a prospective renter. This man failed to inspire confidence in Nelson, and no arrangement was arrived at with him. There-

after Thomas called on his friend, and informed him that he would be willing to rent the ranch himself if the terms were reasonable, and in the course of the conversation invited Nelson to come to Briceland and live with him as one of the family if the ranch should be rented. The next morning Nelson rode into Briceland, called on Thomas, and announced that he had come to stay, and would let Thomas have the ranch for five years at an annual rental of $550. The terms were accepted, and Thomas was told to prepare the lease, which he accordingly did. The document being completed, Nelson expressed a wish to make his will, and requested Thomas to prepare it. He indicated his desire that legacies of five hundred dollars each should be given to two friends, one thousand five hundred dollars to each of the defendants' children, and that the residue of his estate should go to Thomas and his wife, share and share alike. The will was accordingly prepared, being completed that evening.

Up to this point there is no material dispute between the plaintiff and defendants, nor of the fact that on the following evening Nelson executed several papers, one of which was a deed to his property in favor of Thomas and his wife, and left them with Thomas.

The plaintiff was a witness in his own behalf, and testified that he did not know that he had signed a deed; that he had no intention to make a deed of the property; that he supposed he was making a will; that the first intimation he received that he had made a deed was from a friend, one Alfred Grey, who told him that Thomas was claiming to have a deed to the property; that at that time he did not believe Thomas had deceived him, and apparently desiring not to give offense, said nothing to Thomas at the time of what he had heard from Grey; that later, however, becoming apprehensive, he asked Thomas for the paper, and learning that it was in a bank in Eureka, he, although feeble, rode ninety miles on horseback to that city for the purpose of examining it and thus learn if Grey's statement was true; that on being denied an inspection of the document in Eureka he at once returned to Briceland and called on Harry Cowen, a notary public, who had taken his acknowledgments on the occasion of his executing the papers prepared by Thomas, and then learned from him that one of those papers was a deed.

Nelson thereupon left the home of Thomas, where he had been staying for the past fifteen months, employed counsel to advise him, and finally brought this action.

The notary, Cowen, testified that he took the acknowledgment of Nelson to a deed and a lease; that in doing so Nelson admitted to him that the signatures affixed to the deed here involved and the lease were his, but at that time that Nelson did not read the instruments in his presence nor participate in the conversation, but sat back and looked sick, bad, and distressed; that at some time between May 25 and June 5, 1915, Nelson called on him and inquired whether or not one of the papers acknowledged by him on December 30th was a deed; that upon being informed that such was the fact, the color left the man's face, he staggered, made queer motions, and looked horribly shocked.

Another witness, Fred Fearrien, testified: "A few days after December 30, 1913, I asked Thomas if there would be any chance to rent or lease the Nelson ranch, and he said no, that he had already leased it for five years. Later he [Thomas] told me that Mr. Nelson had willed the property to him and his folks and two other parties. I don't think he ever told me he had a deed." It appears that this witness and Thomas were friends of twenty years' standing, and on intimate terms.

Witness Nathan Stansberry testified: "In the spring of 1915 I had a conversation with C. S. Thomas. I came along and Thomas was working on the ranch. We got to talking, and I said jokingly, 'I guess you will give a man something now to kill Nelson for you.' Mr. Thomas said, 'No, Nelson has always been good to me and I am going to be good to him, and maybe he will give me the place some day.'"

Witness Grothe testified: "On April 6, 1915, I rode from Garberville to Briceland with Thomas. He told me Nelson wanted to come to Eureka, and wanted all his deeds and other papers that he [Thomas] had. He said he had them down in a safe in the Bank of Eureka. He was coming down in about two weeks and would get them for Nelson then; that they were Nelson's and he could have them; that they belonged to him. He said the deed and will were the only papers that he had of Mr. Nelson's left at this time. Thomas said, speaking of the lease, that he had read it over several times, and never noticed it before, but there was nothing in

the lease to prevent him from selling all the cattle, and he
could go ahead and sell the cattle.  He said he had a notion
to put the deed on record and sell the cattle, and use the
money to fight the case, but that he was not going to do it.''

Witness William Herman testified: ''The morning Mr. Nel-
son left Thomas' place he [Herman] called there, and Mrs.
Thomas in Mr. Thomas' presence said that when Nelson left
they asked him if, at the expiration of their lease, he would
give them a new one, and that he said he did not know, that
he might want to go back there and live himself.  She also
stated that it was not likely that Nelson would want to go
back there and live any more by himself.''

According to the story of Thomas, told by him on the wit-
ness-stand, after the will had been thoroughly discussed and
prepared, and after he and his wife had retired that night,
his wife suggested to him that as long as Nelson intended
to give them the place, it would be a good plan for Nelson
to make a deed of it to them.  The next morning at the
breakfast-table Thomas said to Nelson that he had been think-
ing the matter over, and that as he was giving them the place,
why not make a deed instead of a will.  That Nelson assented,
and according to the plan then adopted a deed to Thomas
and his wife was made conveying the real property to them,
and a will was drawn disposing of the personal property as
originally provided; that on the evening of December 30th
the will was signed by Nelson with two witnesses; that the
lease and deed of the ranch were signed and acknowledged
by Nelson, and formally delivered to Thomas.

On May 10, 1915, Nelson conveyed the property to Lowrey,
and the deed was recorded the next day.  Ten days there-
after the defendants recorded their deed.  This action was
commenced May 25, 1915.

We think it is clear that the evidence abundantly sustains
the findings of fact, including finding IV (which appears to
be the one seriously attacked by the appellants), to the effect
that the deed made by Nelson was never delivered to the de-
fendants or either of them, and was intended by respondent
as a testamentary disposition to take effect after his death,
and not intended as a present conveyance of the property.

It is true, as asserted by appellants, that the deed was
executed so far as signing and acknowledging it were con-
cerned, and that it was left with the appellants by respondent.

Still it does not follow, under the circumstances of the case, that there was a delivery of the instrument. On the contrary, the evidence establishes that there was no delivery, and without a delivery there could be no deed.

In *Williams* v. *Kidd,* 170 Cal. 638, [Ann. Cas. 1916E, 703, 151 Pac. 3], the court says: "It is essential to the validity of a transfer of real property that there be a delivery of the conveyance with intent to transfer the title, and the test under which delivery is to be determined is in ascertaining whether in parting with the possession of the conveyance the grantor intended thereby to divest himself of title. If he did, there was a defective delivery of the deed. If not, there was no delivery. The solution of the question is grounded entirely on the intention of the grantor, and this essential matter of intention is a question of fact to be determined by the trial court from a consideration of all the evidence in a given case bearing upon the question." (*Cox* v. *Schnerr,* 172 Cal. 371, [156 Pac. 509] ; *Donahue* v. *Sweeney,* 171 Cal. 388, [153 Pac. 708].)

Appellants also complain of the order of the court granting a motion substituting the respondent Nelson as plaintiff in the action for Charles Lowrey, the original plaintiff therein.

At the beginning of the trial the attorney representing the plaintiff pressed a motion which had, it appears, theretofore been perhaps informally made, to substitute Nelson as plaintiff for Lowrey, and for permission to file a supplemental complaint alleging, in conformity with the fact, that the property had been retransferred from Lowrey to Nelson since the filing of the original complaint. Assuming that the defendants were entitled to notice of the motion (as we think they were), still it is plain from the record that they waived such notice. It was stipulated by the parties in open court that through this substitution Nelson was to acquire no greater rights than Lowrey had in the cause. It was also later stipulated that the answer and cross-complaint filed by the defendants should stand as the answer and cross-complaint to the supplemental complaint. The court was painstaking and appeared anxious to proceed cautiously; and all that the defendants did, while entering into these stipulations and consenting, though tacitly, to the substitution, was to say, upon the order of substitution being made, "We have an exception to the ruling of the court."

As before stated, notice was waived; and even if it were not, the objection was not seasonably and clearly presented to the court, and is therefore not available on appeal. (*Mott* v. *Smith,* 16 Cal. 534.) Moreover, it is very clear that the defendants suffered no prejudice as the result of the order, for which reason they cannot now be heard to complain.

The appellants say in their brief: ''Under the complaint and the foregoing facts, what evidence could the plaintiff, Charles Lowrey, introduce on the trial to prove the allegations of his complaint? There was no privity between himself and these defendants. The plaintiff was not in possession,—he was not entitled to possession. All that he had was merely a paper title.'' Continuing, they argue that being the holder of a paper title merely, Lowrey had to trace the chain thereof to the original patentee; that he could not do so because of the break in the chain by the deed to defendants; therefore that the legal title was in defendants, and that Lowrey had merely an equitable estate; that an action to quiet title cannot be maintained by the owner of an equitable estate against the holder of the legal title under a complaint containing only the usual averments made in such actions; that under such a complaint Lowrey could not prove fraud or undue influence or deceit between his grantor and defendants, and therefore when he conveyed to John Nelson, his grantor, and the latter was substituted as plaintiff, a new cause of action arose.

This argument is based upon the assumption that at the date of the commencement of the action the legal title to the property was in the appellants by virtue of the deed of December 30th, but that deed, the court found, was never delivered, and hence conveyed no legal or any title. (*Cutler* v. *Fitzgibbons,* 148 Cal. 562, [83 Pac. 1075].)

Appellants further assume in their argument that the plaintiff is attempting in this action to set aside his deed to the defendants on the ground that it was procured through fraud and undue influence. Such is not the case. The position of the plaintiff is that since there was no delivery of the instrument there was no deed. The situation is well stated in *Cutler* v. *Fitzgibbons, supra,* which was a case in which the complaint contained two counts. The first count contained ordinary allegations in quiet title action. The second count averred that the defendants base their claim to said

land upon a certain written instrument purporting to be a deed, signed, acknowledged, and executed by plaintiff to defendant Fitzgibbons, dated January 14, 1890, conveying to him said land; that plaintiff did not on said day, or at any time, make, sign, acknowledge, or execute said instrument, or any deed conveying said land to Fitzgibbons or to any other person, and did not authorize any other person to execute it for her; that said alleged deed is false, fraudulent, and forged; that said deed has been recorded, and clouds plaintiff's title to said land. The prayer of the complaint was for a judgment quieting plaintiff's title to the land, adjudging that defendants have no estate or interest therein, and decreeing that said deed be canceled, etc. A judgment was rendered quieting plaintiff's title to the land and canceling the deed. The supreme court said: "We see no reason for reversing or disturbing the judgment. Appellant's contention seems to be that respondent is in the position of one who is trying to overturn a legal title on account of fraud, and that the complaint is deficient because it does not state with sufficient fullness the facts constituting the fraud; and he cites in support of his contention *Burris* v. *Adams,* 96 Cal. 664, [31 Pac. 565]. But the facts in *Burris* v. *Adams* are different from those in the case at bar, and the principle applied there is not applicable here. The plaintiff in the case at bar is not trying to set aside a deed which conveyed the legal title on the ground that the deed was procured through fraud, mistake, undue influence, conspiracy, etc. During all the times mentioned in the complaint the plaintiff had the legal title; it certainly did not pass out of her by a written instrument which she did not execute and which was forged. Having the legal title to the land in contest, she brings this action to have her title quieted against appellant, who asserts and proclaims an estate in the land which is without any right, and to have the forged deed under which he claims, and which was recorded, canceled."

For the reasons heretofore given the judgment is affirmed.

Lennon, P. J., and Beasly, J., *pro tem.,* concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court April 29, 1918.